Okay, the next case before the court, 172038, in Re Marquez, it is another appeal from the this time from an examiner's rejection of an initial application or affirming an examiner's rejection of initial application. Mr. Dowd, do you want three minutes? Yes, Your Honor. Okay. All right. Thank you, Your Honor. May it please the court, my name is Matthew Dowd. I represent the appellants who are the inventors of the patent application at issue. I'd like to start off, although there are several issues raised in our appeal brief, I'd like to start off with three, I think, what are fundamental errors that the PTO and the board committed here. And one was raised in the PTO's... Your primary arguments are directed at claim construction. Correct, Your Honor. Is that what you're saying? Yes. If we reject your claim construction arguments, do we necessarily affirm each of the PTO's rejections? I think that's a fair position, Your Honor. I mean, you know, our position really is that although there are 101, 102, 103, 112 rejections, at the end of the day, they all fundamentally come down to the board's and the PTO's misconstruction of several key claim terms. Would you say enablement is the key issue? Enablement is a key issue for two reasons, Your Honor. One, because the PTO brings up the issue of whether we want to come over those rejections. And then second, but fundamentally, the enablement rejection also goes back to the claim construction. And if I could turn to that for a minute... Yeah, let me just take you somewhere. Yes. That is, in the red brief at 15, the PTO says the PTAB adopted Marquez's pro-offered construction of the claims relevant to the enablement requirement. Did they do that? Judge Wallach, I don't think so. There's no indication that either the examiner or the board ever accepted Marquez's constructions of the claims. And for example... Well, was there something in the record where Marquez proposed a construction that the PTAB rejected? Absolutely, Your Honor. OK, where's that? In the record? Yeah. I mean, throughout the record. Well, let me turn to a specific claim, for example, a claim term. A claim term... I'm talking about enablement. Enablement. Before we do that, can we figure out which claims are at issue here? I mean, you say that we should equitably waive waiver and that a lot more than claims 33 and 34 are here. But you admit that unless we reach that equitable conclusion that we allow you to overcome your waiver as to all of the other claims, that we're limiting ourselves to the enablement and other conclusions on claims 33 and 34. Correct, Judge O'Malley. So if the court finds that we did, in fact, waive the enablement rejections for all but claims 33 and 34, all of the rest of the arguments with respect to 101, 102, and 103 are rendered moot. So we accept that. But we also take the position... But they're only rendered moot if we agree with the board that they got the enablement rejection right on 33 and 34. In other words, if we ruled in your favor on enablement, then we would have to look at the 101 rejection as it relates to 33 and 34. I agree, Judge O'Malley. Okay. And let me just turn to a couple of points I want to make before I get into more substance. And one was an issue that the PTO raised in its red brief. And the PTO takes the position that the evidence wasn't properly before the board because it relies on 37 CFR 41.67. That is an error on the PTO's part. But it's important because if that is still the PTO's position, then that alone is enough to reverse or vacate and remand because the PTO is taking the position that all of this evidence in the file history, the board didn't consider it. And that would be an improper way to decide the appeal. But more fundamentally, in terms of the claim construction issues, one error was the PTO has always taken the position that these are product by process limitations. And that's fundamentally wrong when we apply this court's precedent. And a recent case, In Re Nort Development, that came out in February of this year, goes through and provides a two-step process of how we look at a claim and whether it's a product by process claim. And in that case, the invention was directed to an injection molded knee brace. And the PTO took the position that the term injection molded was product by process. This court rejected that, citing numerous cases. And that has always been our position here. So the term assembled, the PTO has always looked at that term assembled as to be a process limitation, meaning that there's no patentable weight given to it. But during prosecution, from the very first office action, the examiner took the position that, well, this is a product by process limitation. Therefore, it has no patentable weight. But if you look at the specification, which you have to do when you're looking at claim terms and trying to determine whether they are product by process limitation, it's clear that the term assembled refers to the characteristics of this non-natural construct. There is no dispute that these are non-natural constructs in terms of what's described in the application. They're individual cells that are first taken separately, and then they are assembled into a particular construct that uses electrostatic forces or hydrophobic forces, and energy minimization forces to create these novel constructs. And that's what the term assembled means. And so it's been always our position that, regardless of whether you look at the 101, 102, 103, 112 rejections, the examiner has always been off base, the PTO, the board has always been off base, because they've misunderstood the invention. Even if we agree with you that it's not a product by process claim, there are still other reasons for the enablement rejection upon which the PTO relied, aren't there? Correct, Your Honor, but that brings up another error that the PTO committed in terms of its enablement analysis. And this, again, pervades the prosecution history from the very first enablement rejection. And the examiner took the position that the applicant here had to enable in vivo uses of these artificial constructs. And I will readily admit to the court that there is some question about whether the specification as drafted and all the articles and evidence that are submitted as part of the prosecution history adequately enable in vivo uses. So, for example, one of the uses of these constructs is to help in terms of organ reconstruction. There's no working example of that. There is no article that describes that being successfully done. So that's questionable. But it's also black-letter law that, in terms of claiming a composition of matter, it's sufficient to enable one use, to enable the claim to that composition of matter. And that's been our argument from day one during prosecution to the board and to this court. So what's the use? The use is for an effective, controlled release of some substance. It's similar to a controlled drug delivery device, whether it's in vitro, in a lab dish, or some sort of construct like that, whether it is in a body where it's controlled release of a substance. And that doesn't necessarily require that you have particular efficacy or particular safety. And there's one point in the final office action by the examiner in 2014 where the examiner rejects the invention for enablement, basically because the examiner takes the position that these uses aren't satisfactorily safe or effective. So all of that ignores a complete... Well, I think there's a difference between saying there has to be a use to which it could be put, and something that's truly useful within the bounds of the patent law. Correct, Judge O'Malley. But I think that brings us to another error in the board's reasoning. And it's my understanding that the PTO has now given up on this position with respect to the utility requirement. Because it was clear from my reading of the board's decision that the PTO, the board was taking the position that these claims aren't enabled because they don't provide a specific utility under 112. Inside the In Re Fisher, which is a classic 112 utility requirement. Before this court, as I read the red brief, the PTO doesn't stand by that position. But it also undermines the entire analysis of whether there is a satisfactorily enabled use. And you're right. But the PTO specifically found that there was no mechanism described in the spec for this release that you're talking about. So where is it? Your Honor, no, I disagree with that in terms that there's no mechanism for the release. Well, you disagree with that, but that's what the PTO found. Well, I think... Tell me where in the spec you think there's a mechanism for the release. One moment, Your Honor. There is absolutely description of a mechanism for release. And in addition, if you look at the specification in connection with the numerous articles that were submitted and part of the file history, the idea of using these constructs to release a substance that's contained within the construct is not necessarily novel. And there's no dispute about how the process works. What's novel and non-obvious about this invention is instead of using chemicals such as polymers to create these colloidal zones, the inventors here for the first time use living cells to create the same structure and the same construct. They're held together by the same fundamental physical and chemical properties. And there's an expectation, a reasonable expectation, that they would operate under the same manner. Now, the examiner, and this has been our position also during prosecution and before this court, is that the examiner and the board never identified any scientific explanation or cited to any article that disputed the explanation and the rationale that's provided in the specification that explains how these constructs work. All right, well, but can you point me to something specific where you think you described this mechanism of release? Somewhere in this appendix. All right, one minute, Your Honor. Thank you for your indulgence. And there are numerous examples. Let me turn to one. At least one working example is the example that uses red blood cells. Give us a site, please. Sure. So an appendix, page 100. Okay. Is example one, and this is another actual example that was constructed. So it's an actual working example. I use yeast cells. And in addition to the description in the application itself, also part of the file history are publications that were published by the inventors, confirming both the method of making this particular construct and also a method of using them in a controlled release function. And if I could turn you to that, I think that. I don't see anything in what you just cited to me that describes the mechanism of release. It describes how it's made. So you're saying we just need to extrapolate from that and say because we could just assume that because it uses some natural cells, we'll just assume it will operate the same way? Not assume, Your Honor. I think it's a reasonable inference. But I think that brings us to an important point about an error that the examiner made and the PTO made throughout this whole process. They took the term artificial gland to require that these constructs had to function like a gland. There is no limitation. There's no requirement in the claim that they actually provide controlled release in the same fashion as an artificial gland. And looking back on it, this may be an instance where instead of using artificial gland, another terminology should have been used. So I think in terms of your question, Judge O'Malley, it gets to the examiner's error in understanding the invention as requiring an actual characteristic or function that is similar to an artificial gland. That's not what these are. These are similar to colloidosomes that are made of chemicals. And there's no doubt based on the literature that's cited that those constructs, colloidosomes, provide some sort of release of the substance that's contained in them. Okay, we're well into your rebuttal. We'll save the rest of it. Okay, do you agree that if we don't find, if we don't waive the waiver, that we're looking at claims 33 and 34? That is correct. That is exactly my position. And if we were to agree with you on enablement, we don't need to look at all the other rejections. That is exactly correct. Okay. I'd appreciate it if you'd start with your statement at 15 of the red brief that the board adopted Marquez's proffered construction of the claims are requiring the cellular components to be isolated or separated from the cells and not located within the cells, which you're basically saying that you accepted their enablement construction. Well, it had to do with the fact that the examiner had construed 33 and 34 at one point to mean that the cell components could be... Right, they disagreed. They agreed with the appellant instead. But that had to do with the prior art rejections and the eligibility rejections. And what the examiner had said initially is that for the purposes of those rejections, I construed this claim to not be limited to cell components by themselves, isolated, separated from cells, and therefore, they read on the prior art, which had complete cells. The board overturned that and reversed in terms of the prior art and the eligibility rejections. And therefore, those claims are not affirmed on eligibility or prior art rejections. But that doesn't change the enablement issue. And if I can turn to the enablement issue, I think it would be helpful to walk through what was going on here. Effectively, all of the claims were upheld on eligibility... I'm sorry, enablement grounds. And Marquez failed to make any arguments with respect to any claims except 30 and 3 and 34. And therefore, the board properly held those were waived and affirmed those rejections and then soundly affirmed the examiner's rejections with respect to 33 and 34. Do you agree with your friend on the other side that the problem is that what the board was crying is they weren't understanding that the gland that was claimed, the artificial gland that was claimed, would have a use separate and apart from an in vitro use? No, that's not at all what was going on. And I could be happy to walk through what's in the specification just briefly and then what the examiner did in their rejection. In the specification, and I think in the blue brief, Marquez has acknowledged that there are prophetic examples and non-prophetic. And principally, they point to example 7, which is what we were just looking at. Figure 7, I'm sorry, which he was just pointing to as the non-prophetic example. And all that's shown there, if I could just walk you through that, that's 168 of the record. Okay, all that's shown here in the top figure is they take, and this is explained at pages 97 to 100 of the record. What they do here is they have a microchannel, which is pictured at 710. They have an aqueous solution, which they explain includes cells, includes a gel precursor and some other components like a buffer, et cetera. They introduce an oil, which is at 712. And then effectively, you get these droplets appearing at 713, which is a droplet, an aqueous solution containing cells. That's also shown in 72, the droplets. Then at 73, they add an acid, they lower the pH. The gel then solidifies in the center and the cells migrate to the outside. So you have a gel surrounded by cells. And that's what's pictured on 74. So that is effectively most of what's in the specification. There's also example one, which I think the council, my opposing council mentioned, that is using yeast cells, but it's essentially doing the same thing. So what is not enabled? So beyond what the examiner then said, and they had a list of issues, and that is, sorry. And clearly, these have to be man-made, right? These are man-made, but they don't look anything different than at the examiner's rejection, which is at pages 950. They don't look anything different. I mean, are you saying that if we get an artificial pancreas or artificial anything else, that somehow because it works the same, it's not patentable, even though it is not a product of nature, it's a product of man? This goes to the eligibility and the prior art rejections. And I'll be happy to talk about this, but I wanted to finish with the enablement. Okay, but I'm still having a hard time understanding what's not enabled. So what is it that you said? So that's where we can turn to the examiner's rejection, which is at, initially at 793 to 790, I'm sorry, at 950 to 953 of the reject of the record, but then was reiterated in the examiner's answer at 793 to 797, and they had a list of things. And the one was, of course, the fact that gland has a well-known meaning in the art. One understands a gland to be things like pituitary and adrenal and so forth, and you've not shown that these things act like a gland that produces a substance that then has activity elsewhere. So that was one. But they also said other issues. They talked about the fact that the reservoir in the specification is described as being a gas, a liquid, or a gel. They said you've provided no evidence on how a gas could be effective and work in the same way that a gel can. The examiner also said that there's no guidance in terms of drug delivery.  Most of this is prophetic. And if you look, in fact, 7 to 21 is basically a wish list of how this could be used. Are you saying that the word artificial doesn't modify the word gland at all? No, the issue is... So you agree that what basically the examiner said is you can't be enabled unless you work exactly like a human gland. That was one issue, okay? That was not the bulk of the examiner's rejection. One issue is that you're using a term that's well-established in the art. You haven't separately defined it in the specification. And therefore, that's just one issue. But there are a multitude of issues that the examiner raised that I'm going through. It seems what the examiner is saying that it's not enabled unless it works. Leaving aside exactly like... One issue is it doesn't work like a gland. The other issue is that you haven't shown how to do this with something like a gas. The other issue is that you haven't shown any guidance on drug delivery, which is one of the principal things that you say you could use for. There's absolutely no guidance in terms of tissue or organ regeneration. That's a very unpredictable art. There's really nothing known or not been much success in that area. So the examiner raised a host of issues. I guess what I'm trying to understand is it seems like the examiner said, well, okay, you've come up with this cool invention, but I think you should have come up with a cooler invention that covers a lot more stuff. So isn't the examiner asking that more be enabled than actually is being claimed? Now, what the examiner is saying is that, yes, we grant you that you have this very limited example and you've developed this sort of structure, but you haven't shown in any way how to use it in particular in claims 33 and 34 using cell components, which is very different. And you haven't shown how to use any of these things. So like we said, with respect to all these arguments that the examiner made in response in the appeal brief before the board, Marquez at pages 730 to 733 of the record only argued claims 33 and 34. They waived all the other issues. But that is... All right, we agree with the waiving, or I am for purposes of this argument. But if... So are you saying that if they claimed less, I mean, if they discussed less in the specification about where this might take us in the future, that then it would be more enabled? No. I'm really having a hard time following this. There are two parts of it. The two parts, one is how to make and one is how to use. And let's focus on claims 33 and 34 because those are the principal ones that were not waived. Respect to claims 33 and 34, and I just wanted to raise that as a backdrop that there were a lot of issues going on and much of which was not argued, was not disputed before the board by Marquez. So those arguments were waived. With respect to claims 33 and 34, what the examiner said is that the only guidance with respect to cell components, and that is at paragraph 59 in the specification, which is largely just a recitation of various things that could be used, various cellular components that could be used, everything from enzymes to growth factors to antibodies to organelles within the cell, things like mitochondria and endoplasmic reticulum, chloroplasts, DNA, RNA, everything under the sun, essentially. And the examiner said, you have not provided guidance on how in the world you would make some kind of a, what they call a gland, using these things. So it's a list of ingredients without any instructions on how to put them together. Right. And the only examples in the specification use cells, not cell components. Exactly. And in fact, the examiner even said, you know, it's well known that cells naturally adhere to one another. There's no evidence that these sorts of things would do that and would operate to the... Is there any evidence in the record that cell components would just operate in the same way that cells do, that a skilled partisan would understand that this is just basic science? No. And that's exactly what the examiner and the board said, that there's nothing in the prior art. And this is the board's decision at pages 30 to 31 of the record and the examiner's decision at 812 to 815. They basically said, there's nothing other than this paragraph 59. There's no teaching about cellular components. There is nothing, no citation to prior art that would provide guidance in terms of how you would assemble cellular components. And given that, there is really not enough in the specification to guide a person's skill in the art to construct some kind of glands using cellular components. And furthermore, they said there's no teaching about how to make, but also similarly, like with the ones with cells, there's no teaching about how to use. And if I may, the board recognized, for example, that the introduction of the specification describes potential uses being stem cell engineering, organ and tissue repair and replacement, a lot of big ideas. And again- What about the yeast example? Isn't that seemed to be enabled? They teach you how to make, again, all that is taught. And it's very much like what we've just looked at in figure seven, is a gel with yeast around it. But in terms of how to use that, in terms of drug delivery, they've actually have no examples in here of putting something in the middle and getting successful delivery of a drug to administering to a human and getting drug delivery or even in vitro drug delivery. So they don't have any sort of examples of drug delivery, certainly no examples of getting tissue regeneration, doing tissue repair or replacement. And example seven to 21 have a whole host of things. They talk about treating diabetes and cystic fibrosis, lung disease- But again, those are just prophetic. That someday- Those are all prophetic. It might be helpful. Right. Do we have any case law that says if you say something like that, that you therefore have to enable every one of those things? You don't have to enable any of those, especially if you're not claiming- But you have to enable something. And here we have no, basically no enabled. Because all the uses are effectively prophetic and they haven't shown us any uses. And more importantly, they haven't showed us how to make such structures using cell components. And as a consequence, there's simply a lack of guidance in the specification and the invention is not enabled. Just out of curiosity, in the gray brief, Marquez claims that the PTO concedes the spec satisfies the utility requirement under 112. Do you concede it? And if you do, does that have any impact on enablement? I don't think it has any impact. We did not separately argue the utility. That was sort of an alternative ground that the board decided to do utility and made arguments about utility. We don't think it's necessary to go there. We rest on the enablement, entirely on enablement. And we think it's completely defensible on that ground. Thank you. Judge Wallet, to answer your question, I think the case law is clear. If we raise an argument in our blue brief and the PTO doesn't respond to it in the red brief,  Not that it resolves the question here, Your Honor, but judge, you used to answer your question about whether cell components operate in the same way as cells. I think what the board did incorrectly here is ignore all the evidence where we have an established field that uses smaller chemical components to make colloidal zones. And we have evidence in the specification that uses cells. We've described that they operate under the same basic scientific principles. And the board never responded to that, other than a single sentence, which is at, I believe, A33. And they don't provide, the board doesn't provide an explanation of why it disagrees with the statement in the specification about how these operate. And under this court's case law, that's not sufficient for the PTO to do. They have to provide some explanation of why the applicant's explanation of why the invention works the way it does is not reasonably believable by a person of skill in the art. And I will point, as one last point, Your Honor. You never provided a working example of claim 33 and 34, did you? No, Your Honor, we did not of the cellular components. There's no working example of that. But we would point the court to the independent research by the UK group that shows that there is a use that these can be made in terms of the cell constructs and we find it... Those post-dated the date of application? Correct, Your Honor. But the law is clear that you can rely on post-filing evidence to confirm the enablement of a specification that's filed earlier if you're following what's taught in the specification. But you don't point out that any in vitro testing was done, right? I'm sorry, in vivo. In vivo testing? Yeah. Correct, Your Honor. There's been no in vivo testing and our position is that based on the in vitro uses of the similar chemical-based constructs and the working examples that we've shown here and the absence of any scientifically-based explanation by the board, that's sufficient to show that our claimed constructs are enabled. Unless there are any further questions? No, thank you. Thank you, Your Honors. All right, the next case before the court.